| | | |
|---|---|---|
| CHUNHONG JIA; NAIHAN LI; NAIRUO LI; SHULEI WANG; LIZHONG YAO; WEIWEI ZHANG; CHONG ZHAO, | : : : : | Case No. 1:18cv85 |
| Plaintiffs; | : : | Judge: |
| v. | : : | |
| GARY CHAN; TERRY CHAN; JACQUELYN CHAN; BOARDWALK FRIES OPPORTUNITIES, L.P.; BWF MGMT, LLC; BOARDWALK FRIES, LLC; JARDIN HILL, LLC; ARCHWAY PARTNERS, LLC; CLEARWATER HOSPITALITY GROUP, LLC, | : : : : : : : : | |
| Defendants. | : | |

## COMPLAINT

Now comes Plaintiffs Chunhong Jia, Naihan Li, Nairuo Li, Shulei Wang, Lizhong Yao, Weiwei Zhang, and Chong Zhao ("Plaintiffs"), and for their complaint against Defendants, Gary Chan, Terry Chan, Jacquelyn Chan, Boardwalk Fries Opportunities, L.P. ("BWF OPP"), BWF MGMT, LLC ("BWF MGMT"), Boardwalk Fries, LLC ("BWF LLC"), Jardin Hill, LLC ("Jardin"), Archway Partners, LLC ("Archway"), and Clearwater Hospitality Group, LLC ("Clearwater") (collectively, "Defendants"), states as follows:

## THE PARTIES

1.       Plaintiffs are citizens and residents of the People's Republic of China, and are limited partners of BWF OPP.  In 2014, Plaintiffs joined BWF OPP, an Ohio limited partnership organized to allow foreign investors to utilize the EB-5 Visa program.

2.       Defendant Gary Chan is a citizen of the State of Florida, and a resident of

Orlando, Orange County, Florida. Gary Chan is an officer, partner and/or principal in BWF OPP, BWF MGMT, BWF LLC, Jardin, Archway, and Clearwater (collectively, the "Chan Entities"). Gary Chan was integral in the formation of BWF OPP, BWF MGMT, and other Chan Entities, and has actively managed, directed and controlled their activities such that they have no separate mind or will of their own.

3.      Defendant Terry Chan is a citizen of the State of Florida, and a resident of Orlando, Orange County, Florida. Terry Chan is an officer, partner and/or principal in the Chan Entities, and was key to their formation. Terry Chan was integral in the formation of BWF OPP, BWF MGMT, and other Chan Entities, and has actively managed, directed and controlled their activities such that they have no separate mind or will of their own.

4.      Defendant Jacquelyn Chan is a citizen of the State of Florida, and a resident of Orlando, Orange County, Florida. Jacquelyn Chan is an officer, partner and/or principal in, and was integral in the formation of, the Chan Entities. Jacquelyn Chan actively managed, directed and controlled the activities of all or some of the Chan Entities such that they have no separate mind or will of their own.

5.      Defendant BWF OPP is an Ohio limited partnership with its principal place of business located in Cincinnati, Hamilton County, Ohio. BWF OPP is controlled by its General Partner, BWF MGMT, and Terry Chan, Gary Chan and Jacquelyn Chan (collectively, the "Chans"), all of whom are officers and/or partners of BWF OPP and active in its management and control.

6.      BWF MGMT is an Ohio limited liability company with its principal place of business in Ohio. BWF MGMT is the General Partner of BWF OPP. BWF MGMT is managed by BWF LLC, but Archway is also a member of BWF MGMT. BWF MGMT is actively

controlled by the Chans.

7.     BWF LLC is an Ohio limited liability company with its principal place of business located in Ohio. BWF LLC was formed on November 5, 2015, and the Chans actively manage, control and direct its activities such that it has no separate mind, will, or existence of its own. Gary Chan incorporated BWF LLC.

8.     Defendant Jardin is an Ohio limited liability company with its principal place of business located in Ohio. The Chans are members, officers, and/or principals of Jardin, and they actively manage, control and direct its activities such that it has no separate mind, will or existence of its own.

9.     Archway is an Ohio limited liability company with its principal place of business located in Ohio. The Chans are members, officers, and/or principals of Archway, and they actively manage, control and direct its activities such that it has no separate mind, will or existence of its own.

10.     Clearwater is an Ohio corporation with its principal place of business located in Ohio. Jacquelyn Chan is the sole owner of Clearwater. Clearwater is actively managed, controlled, and directed by the Chans such that it has no separate mind, will or existence of its own.

## JURISDICTION AND VENUE

11.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this civil action involves claims arising under the laws of the United States. Specifically, a number of the Defendants have violated federal securities laws.

12. Pursuant to 28 U.S.C. § 1391, venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims occurred in this District, and because Defendants are subject to personal jurisdiction in this District.

## NATURE OF THE ACTION

13. This is an action that Plaintiffs assert against Defendants for, among other things, breach of contract, unjust enrichment/quantum meruit, gross negligence, breach of fiduciary duty, conversion, fraud, conspiracy, piercing the corporate veil, and punitive damages to remedy Defendants' unlawful actions, which include gross mismanagement, embezzlement, and self-dealing of Plaintiffs' investment proceeds in BWF OPP.

14. The Chans have orchestrated a complex enterprise, run through the Chan Entities, to convert Plaintiffs' funds. The Chans have utilized this enterprise to enrich themselves and inappropriately finance the operation of entities they control. This enterprise is ongoing and the Chans are still continuing to misappropriate the funds of investors, corporate entities, and/or businesses through the Chan Entities to carry on their fraudulent scheme.

## THE EB-5 PROGRAM

15. Plaintiffs re-state paragraphs 1-14 as if fully rewritten.

16. In 1990, Congress established the EB-5 Program in order to bring new investment capital into the United States and create new jobs for U.S. workers.

17. Under the EB-5 Program, immigrants who invest their capital in job-creating business enterprises in the U.S. receive "conditional" permanent resident status in the U.S. for two years after their I-526 application is approved. If, after the two-year period, the immigrants satisfy the EB-5 Program conditions and other Program criteria, USCIS removes the conditions

and the immigrant investors become lawful permanent residents.  In other words, the immigrant investors obtain their "Green Cards."

18.     In essence, the EB-5 Program has three key components: (a) immigrant investment of capital; (b) in a new commercial enterprise; that (c) creates jobs.

19.     To avail oneself of the EB-5 Program, the immigrant investor must invest at least $1,000,000 of capital in new commercial enterprise that creates at least 10 jobs, unless the immigrant invests his or her capital in what is called a "targeted employment area."  In that case, the immigrant must invest $500,000.

20.     Defendants used the EB-5 Program to lure Plaintiffs into investing a combined $3,500,000 in BWF OPP, a purported redevelopment project in Ohio.  As will be discussed more fully below, all or part of Plaintiffs' combined $3,500,000 investment has been unlawfully converted by the Chans without Plaintiffs' consent.

## **BWF OPP'S STRUCTURE**

21.     In or before 2013, all or some of the Chans began marketing BWF OPP to foreign investors eager to use the EB-5 visa process.

22.     In connection with the solicitation of prospective investors and Plaintiffs, all or some of the Chans, for themselves and for many of the Chan Entities, provided Plaintiffs with BWF OPP's Business Plan ("Business Plan").  This Business Plan detailed the scope of BWF OPP, how it would operate, and how it would be managed.

23.     The Chans created, directed, and/or otherwise approved the content and statements contained in the Business Plan, and were integrally involved in the marketing, distribution, and publication of these materials to Plaintiffs.  A true and accurate copy of the Business Plan is attached hereto as **Exhibit A**.

24.     The Business Plan outlined BWF OPP's general structure, and explained that BWF MGMT would act as BWF OPP's General Partner.  Additionally, the Business Plan said that 12 foreign investors, such as Plaintiffs, would invest $500,000 each into BWF OPP, for a combined $6,000,000 investment.  After this investment, each Plaintiff would be admitted as a limited partner of BWF OPP.

25.     In addition to this $6,000,000 foreign investment, the Business Plan said that BWF MGMT would contribute $3,000,000 to BWF OPP.  BWF OPP was therefore supposed to be financed with a combined $9,000,000.

26.     In addition to these representations, the Business Plan informed potential investors that:

- BWF OPP would seek to build ten Boardwalk Fresh Burgers and Fries, Inc. ("Boardwalk Fries") restaurants in ten "target locations" in and around Cincinnati, Ohio and Dayton, Ohio;

- Archway was retained to administer the EB-5 aspects of BWF OPP;

- BWF LLC, the "managing member" of BWF MGMT, was founded in 1981 in Maryland, and operated Boardwalk Fries restaurants in eight states;

- BWF LLC was supposed to manage the "start-up and stabilization" of each Boardwalk Fries restaurant;

- Boardwalk Fries' CEO, David DiFerdinando, was a part of BWF OPP's Management Team, along with Terry and Jacquelyn Chan;

- BWF OPP intended to return EB-5 investors' capital "at the latter" of the three-year anniversary of each investors' I-526 approval, or once each investors' I-829 application was approved by USCIS;

- Ten Boardwalk Fries restaurants would be constructed in a two-year time period, with five restaurants being constructed in the first year, and five in the second year;

- The ten Boardwalk Fries restaurants would all be constructed by May 2016, and,

- Investors would receive their I-829 approvals in 2016.

The involvement of both Boardwalk Fries and DiFerdinando was consistently highlighted in BWF OPP's Business Plan to make it appear like they were integrally involved in the project.

28. The Chans also provided interested investors, such as Plaintiffs, with BWF OPP's "Agreement of Limited Partnership" ("Partnership Agreement") that states a number of terms. A true and correct copy of the Partnership Agreement provided to Plaintiffs is attached hereto as **Exhibit B**.

28. The Partnership Agreement explains that BWF OPP is controlled by BWF MGMT, its general partner. The Partnership Agreement also explained BWF OPP's purpose:

> The purpose and business of [BWF OPP] shall be to invest in and/or loan money to various entities in Targeted Employment Areas that are operating a business for the purposes of stimulating economic development and job creation through organizing and owning wholly owed [sic] subsidiaries to: (i) open and operate 10 Boardwalk Fries restaurant franchises in Ohio and (ii) own and lease real estate to such franchises[.]

This purpose was in accord with the terms of the BWF OPP's Business Plan, which is attached as an exhibit to the Partnership Agreement.

29. The Partnership Agreement defines a "Targeted Employment Area" as an area that "has been designed by parties acceptable to the USCIS … [and] that has experienced unemployment of at least 150% of the national average rate at the time a Limited Partner made his or her Capital Contribution."

30. The Partnership Agreement states that investors, such as Plaintiffs, will be admitted as a limited partner in BWF OPP if they decided to invest.

31. However, because BWF OPP was designed to comply with EB-5 regulations as a vehicle for Plaintiffs to obtain U.S. resident status, Plaintiffs could not be admitted into BWF OPP if their I-526 petitions were ultimately not approved.

32.     Importantly, no limited partner has "any right or power to take part in the management or control of the Partnership" under the Partnership Agreement. Instead, BWF MGMT controlled the Partnership as its general partner.

33.     BWF MGMT had a number of responsibilities under the Partnership Agreement. The "Management" section of the Partnership Agreement explains that BWF MGMT "shall have the sole and exclusive right and responsibility to manage the business of the Partnership."

34.     BWF MGMT must care for BWF OPP's funds, including Plaintiffs' funds, pursuant to the Partnership Agreement.

35.     Further, the "Duties and Obligations of [the] General Partner" section of the Partnership Agreement states that BWF MGMT "shall cause the Partnership to conduct its business and operations separate and apart from that of the General Partner and its affiliates." This includes BWF MGMT's responsibility to "segregat[e] Partnership assets" and to "not allow[] funds or other assets of the Partnership to be commingled with the funds or other assets of, held by, or registered in the name of [BWF MGMT] or any of its affiliates."

36.     This provision prohibits BWF MGMT from engaging in self-dealing and bars BWF MGMT from co-mingling BWF OPP's assets with the assets of other affiliated companies. This section also explains that:

> The General Partner shall take all actions that may be necessary or appropriate (i) for the continuation of the Partnership's valid existence as a limited partnership under the laws of the State of Ohio . . . to protect the limited liability of the Limited Partners or to enable the Partnership to conduct the business in which it is engaged and (ii) for the accomplishment of the Partnership's purposes, including the acquisition, development, maintenance, preservation and operation of Partnership's property in accordance with the provisions of [the Partnership Agreement] and applicable laws and regulations.

BWF MGMT is accordingly required to take all actions necessary to ensure that BWF OPP

remains a valid entity and to accomplish BWF OPP's purpose.

37.     BWF MGMT must also ensure that "[a]ll property in the form of cash not otherwise invested" is deposited "for the benefit of the Partnership" in accounts belonging to the Partnership or its affiliates, in short-term liquid securities, or left in escrow.

38.     The Partnership Agreement binds BWF MGMT to specific performance of the contract, and explains that every partner, including Plaintiffs, "would be irreparably damaged if any of the provisions of this [Partnership] Agreement are not performed in their specific terms."

39.     Finally, the Partnership Agreement contains a Schedule of Partners ("Schedule"). This Schedule shows that BWF MGMT will make a $3,000,000 capital contribution to BWF OPP.

40.     This contribution was an essential and material representation to investors such as Plaintiffs, as it indicated that EB-5 investments would not be the only basis of funding for BWF OPP. Further, this contribution reduced Plaintiffs' concerns that BWF MGMT may breach the contract or abscond with investor funds, as BWF MGMT would lose a substantial amount of funds if BWF OPP failed.

41.     This schedule also says that 12 total EB-5 investors will be investing in the project, and that their combined investments will total $6,000,000.

42.     Overall, the Partnership Agreement says that $9,000,000 would be invested in BWF OPP.

43.     The Partnership Agreement was signed by Gary Chan on behalf of Archway. It was also purportedly signed twice by DiFerdinando as the president of BWF LLC.

44.     Plaintiffs signed a "Counterpart Signature Page and Attestation" in 2014, making them BWF OPP investors and limited partners.

45.     As Plaintiffs would later find out, the Business Plan and Partnership Agreement provided to them were false in significant and material ways.

46.     For example, DiFerdinando and Boardwalk Fries were not involved with BWF OPP, BWF MGMT, and BWF LLC to the extent represented in the Business Plan and Partnership Agreement.

47.     BWF LLC also did not exist at the time Plaintiffs invested in BWF OPP.  Gary Chan did not organize this entity in Ohio until November 5, 2015.

48.     Further, DiFerdinando claims that his signatures on an operative BWF OPP document, BWF OPP's Management Agreement, are not his.  He therefore may not have signed the Partnership Agreement.

49.     The Partnership Agreements provided to and executed by Plaintiffs therefore contained numerous misrepresentations fraudulently designed to entice their investments.

50.     Plaintiffs were also provided with BWF OPP's Subscription Agreement and Private Placement Memorandum ("PPM") before they invested in BWF OPP.  The PPM included many of the same misrepresentations contained in BWF OPP's Business Plan and Partnership Agreement.  Plaintiffs each had to sign BWF OPP's Subscription Agreement to invest in BWF OPP.

51.     On February 26, 2014, plaintiff Chunhong Jia entered into a Subscription Agreement offering to purchase one Unit in BWF OPP for $500,000.  A copy of Chunhong Jia's signed Subscription Agreement is attached hereto as **Exhibit C**.

52.     On May 29, 2014, plaintiff Naihan Li entered into a Subscription Agreement offering to purchase one Unit in BWF OPP for $500,000.  A copy of Naihan Li's signed Subscription Agreement is attached hereto as **Exhibit D**.

53.    On May 22, 2014, plaintiff Nairuo Li entered into a Subscription Agreement offering to purchase one Unit in BWF OPP for $500,000.  A copy of Nairuo Li's signed Subscription Agreement is attached hereto as **Exhibit E**.

54.    On December 12, 2014, plaintiff Shulei Wang entered into a Subscription Agreement offering to purchase one Unit in BWF OPP for $500,000.  A copy of Shulei Wang's signed Subscription Agreement is attached hereto as **Exhibit F**.

55.    On May 22, 2015, plaintiff Lizhong Yao entered into a Subscription Agreement offering to purchase one Unit in BWF OPP for $500,000.  A copy of Lizhong Yao's signed Subscription Agreement is attached hereto as **Exhibit G**.

56.    On March 5, 2014, plaintiff Weiwei Zhang entered into a Subscription Agreement offering to purchase one Unit in BWF OPP for $500,000.  A copy of Weiwei Zhang's signed Subscription Agreement is attached hereto as **Exhibit H**.

57.    On January 27, 2014, plaintiff Chong Zhao entered into a Subscription Agreement offering to purchase one Unit in BWF OPP for $500,000.  A copy of Chong Zhao's signed Subscription Agreement is attached hereto as **Exhibit I**.

58.    This subscription agreement and PPM required Plaintiffs to direct their $500,000 to an  escrow account after they decided to invest in BWF OPP. Plaintiffs' funds were then held in individual escrow accounts until their I-526 petitions were approved.

59.    Plaintiffs each directed $500,000 to individual escrow accounts maintained at U.S. Bank, National Association.

60.    Plaintiffs' 1-526 petitions were approved in 2015.  After this approval, the Chans caused 90% of Plaintiffs' funds to be released from their respective escrow accounts.  10% of Plaintiffs' funds were held back in their respective escrow accounts.

61.     Plaintiffs' funds that were released from escrow were then deposited into a bank account in BWF OPP's name at General Electric Credit Union ("GE Credit").

## THE CHANS CONTINUE LYING TO INVESTORS AND THIRD PARTIES, AND BWF OPP MOVES TO FLORIDA

62.     The Chans promised to update Plaintiffs on a monthly, quarterly, and annual basis to provide them with information about their investments, and to inform them about progress being made in the construction and operation of Boardwalk Fries restaurants.

63.     However, the Chans repeatedly failed to provide these updates, and when they did, these updates were riddled with errors and misrepresentations.

64.     For example, on February 23, 2016, Gary Chan provided an update to Lili Wang, a consultant Plaintiffs retained to assist them in the EB-5 process.   A true and correct copy of this update is attached hereto as **Exhibit J**.

65.     This update informed investors that, in the last quarter of 2015, BWF OPP had purportedly: (1) identified sites for restaurant development and were in a leasing/pre-construction stage on those sites; (2) retained ML Barnard, Inc. ("ML Barnard") to construct Boardwalk Fries restaurants, and (3) had selected local and national vendors.

66.     The Chans also represented to investors that they had been "in constant contact with Boardwalk Fries Corporate," and that the projected opening date for Boardwalk Fries restaurants located in three parts of Cincinnati "will be in Q2 of 2016."   The Chans also represented that they planned on opening six Boardwalk Fries restaurants in 2016.

67.     This update additionally told investors that their capital had been used to place deposits with contractors and vendors to facilitate the construction of Boardwalk Fries restaurants.

68.     Included with this update was a letter that appeared to have been drafted and

prepared by an employee of ML Barnard. This letter, dated October 16, 2015, said, "[p]lease note that we are in receipt of a deposit in the amount of $500,000, which we have required to secure priority placement of construction services for multiple upcoming Boardwalk Fries restaurants."

69.    This letter was not written by ML Barnard. It was instead drafted by one or all of the Chans.

70.    ML Barnard was never retained by the Chans to perform construction work for Boardwalk Fries restaurants. ML Barnard was instead retained by the Chans to construct Rodizio Grill restaurants.

71.    These Rodizio Grill restaurants belonged to RG Opportunities I, L.P., and RG MGMT, LLC, entities controlled by the Chans.

72.    In or before October 2015, ML Barnard had billed the Chans $600,000 for construction work related to Rodizio Grill restaurants. The Chans initially tried to pay ML Barnard via a check paid by Clearwater. This check bounced. The Chans then prepared a $500,000 check to ML Bernard to be paid from BWF OPP's GE Credit bank account.

73.    The Chans' intentional mischaracterization of the $500,000 payment in the update was designed to not only hide the fact that the Chans had misappropriated BWF OPP's funds, but to also mislead Plaintiffs into believing that BWF OPP was actively working to open and operate Boardwalk Fries restaurants.

74.    Despite the "progress" being made in developing Boardwalk Fries restaurants in Ohio, the Chans decided to abandon the Ohio focus of this project later in 2016. The Chans did not want to develop restaurants in Ohio because they wanted to move to Orlando, Florida.

75.    Later in 2016, the Chans sent Plaintiffs a second quarter construction update for

BWF OPP. This update informed Plaintiffs that BWF OPP planned to open Boardwalk Fries restaurants in Bradenton, Florida; Buena Vista, Florida; Tampa, Florida; Middletown, New York; Poughkeepsie, New York; and, Holyoke, Massachusetts. A true and correct copy of the Boardwalk Fries Q2 2016 Construction Update is attached hereto as **Exhibit K**.

76.     This representation, and these materials, were false. The Chans have only signed two franchise agreements with Boardwalk Fries to develop restaurants, and only one of these franchises is located in one of the six locations detailed in the construction update. These agreements call for the development of Boardwalk Fries restaurants on 451 E. Altamonte Drive in Altamonte Springs, Florida, and in the Vista Center Shoppes in Buena Vista, Florida.

77.     The Chans have, unfortunately, defrauded the landlords at both of these locations. The Chans lied to these landlords to obtain tenant allowances to update these properties.

78.     For example, Terry Chan secured a $100,000 tenant improvement allowance at the Vista Centers location through fraud. To secure this allowance, Gary Chan sent the landlord a letter purportedly written by DCH Custom Builder, Inc.

79.     This letter, like the ML Barnard letter discussed above, was fake. Dave Hewitt, the owner of DCH Custom Builder, says his company did not write it.

80.     A Boardwalk Fries restaurant will not be built at this location. The landlord of this location moved to evict the Chans and Clearwater from this property, and a were put in possession of the property on January 25, 2018. The landlord moved for default because, among other things, the Chans did not pay rent and failed to demonstrate that they had used the allowance in appropriate ways.

81.     Terry Chan also negotiated for a $900,000 tenant allowance at the Altamonte Springs location. The landlord has distributed $300,000 to the Chans pursuant to this allowance,

and this distribution was contingent on demolition work being performed at the property. The Chans, however, have not performed this work.

82.     Further, it appears that no Boardwalk Fries restaurant will be built at this Altamonte Springs location because the landlord has not allowed for the development of this restaurant. The landlord has only allowed a Rodizio Grill to be built at this location.

83.     The Chans have failed to develop a single Boardwalk Fries restaurant in the approximately four years since Plaintiffs invested in BWF OPP. That Chans' failure to develop a single restaurant is startling given that they received $3,500,000 from Plaintiffs.

## THE CHANS HAVE MISAPPROPRIATED PLAINTIFFS' FUNDS

84.     On top of the Chans deceit and outright forgery, the Chans have misappropriated all or some of Plaintiffs' funds.

85.     As is discussed above, the Chans paid ML Barnard $500,000 of BWF OPP's funds to pay for the construction of Rodizio Grill restaurants. BWF MGMT has not made a $3,000,000 contribution to BWF OPP, so this $500,000 was paid using Plaintiffs' funds.

86.     To the best of Plaintiffs' knowledge, BWF OPP only possesses less than $1,900,000 of the $3,500,000 that Plaintiffs invested. As of June 2017, BWF OPP's General Electric Credit Union bank account only held approximately $1,500,000 of Plaintiffs' funds. Further, escrow accounts at U.S. Bank only hold about $350,000 of Plaintiffs' funds. The Chans have therefore spent at least $1,600,000 of Plaintiffs' funds for purposes unrelated to the construction of Boardwalk Fries restaurants.

87.     Plaintiffs can only account for the $500,000 that was sent to ML Barnard. Plaintiffs cannot account for the remaining assets spent by the Chans.

88.     Bank records, however, demonstrate that the Chans have comingled BWF OPP's

funds with assets belonging to other Chan Entities.

89.     For example, these records show that the Chans caused BWF OPP's funds to be deposited into a BWF OPP account at First Financial Bank.  From there, these funds were routed to and through accounts belonging to BWF MGMT, BWF LLC, Jardin, Clearwater, and other entities owned and controlled by the Chans.

90.     Plaintiffs' funds were routed to and through these accounts to conceal their source, nature, and identity.  After these funds were laundered through these accounts, they were paid directly to the Chans, were used to pay Rodizio Grill employees, and were used to finance the operation of Rodizio Grill restaurants.

91.     The Chans have laundered and converted, at the very least, hundreds of thousands of dollars of Plaintiffs' funds through bank accounts belonging to the Chan Entities.

92.     At this point, Plaintiffs have collectively lost at least $1,600,000 in this project, and no Boardwalk Fries restaurant have been constructed.  Plaintiffs also do not know the status of the project, or how much of their funds remain, because the Chans have refused to update them about BWF OPP.  The Defendants have placed Plaintiffs in a disastrous position as a result of the numerous acts of malfeasance discussed above.

**Count I – Federal Securities Law Violations**

**(Terry Chan, Gary Chan, Jacquelyn Chan, BWF OPP, BWF MGMT, BWF LLC, Archway)**

93.     Plaintiffs restate paragraphs 1 through 92 above as if fully rewritten.

94.     Terry Chan, Gary Chan, Jacquelyn Chan, BWF OPP, BWF MGMT, BWF LLC, and Archway (collectively, the "Management Defendants") violated federal securities laws in connection with the actions discussed herein.

95.     15 U.S.C. § 78j(b), as well as Rule 10b-5, 17 C.F.R. § 240.10b-5, prohibits any person from making any untrue statement of material fact, or from omitting certain material facts, in connection with the purchase or sale of any security.

96.     The Management Defendants were all involved in the creation of materials provided to Plaintiffs before they invested in BWF OPP, including BWF OPP's Business Plan and Partnership Agreement.    These materials were sent to Plaintiffs using means or instrumentalities of interstate commerce, or the mails.

97.     These materials each contained a number of misrepresentations about BWF OPP that were designed to entice Plaintiffs' investment.

98.     For example, the Management Defendants misrepresented that BWF LLC was Boardwalk Fries, and that BWF LLC existed in 2013 or 2014, the time Plaintiffs were considering an investment in BWF OPP.  BWF LLC, however, is not Boardwalk Fries, and was not created until 2015.

99.     The Management Defendants also misrepresented that Boardwalk Fries and DiFerdinando would be extensively involved in the operation of BWF OPP, BWF MGMT, and BWF LLC.    However, neither DiFerdinando nor Boardwalk Fries agreed to extensively participate in the management or operation of these entities.

100.    DiFerdinando claims that his signatures on an operative BWF OPP document are not actually his.  This shows that the Management Defendants may have forged this signature on documents, or were aware that his signatures were forged.

101.    The Management Defendants also represented to Plaintiffs that BWF MGMT would invest $3,000,000 into BWF OPP.  BWF MGMT, however, has not invested these funds. Defendants, by virtue of the fact that they control BWF MGMT, knew that BWF MGMT would

not invest these funds at the time the Management Defendants solicited Plaintiffs' investments.

102.　Plaintiffs justifiably relied on these false statements and/or omissions when deciding to invest in BWF OPP. These were material representations about the viability, structure, and financing of BWF OPP, and about the risk of loss Plaintiffs faced in this investment.

103.　Plaintiffs are a purchaser of securities and the Management Defendants are sellers of securities. The Management Defendants not only held title of the security before it passed to Plaintiffs, but they also played a substantial role in persuading Plaintiffs to buy the securities.

104.　The Management Defendants' misrepresentations proximately caused Plaintiffs' injuries and loss because Plaintiffs would not have invested in BWF OPP but for these misrepresentations.

105.　As a direct and proximate result of the Management Defendants' conduct, Plaintiffs have been damaged in an amount in excess of $3,500,000, plus interest, attorney's fees, and costs, punitive damages, and any other relief as provided by law.

## Count II – Fraud

**(Terry Chan, Gary Chan, Jacquelyn Chan, BWF OPP, BWF MGMT, BWF LLC, Archway)**

106.　Plaintiffs restate paragraphs 1 through 92 above as if fully rewritten.

107.　The Management Defendants provided Plaintiffs, or caused Plaintiffs to be provided, with a Business Plan and Partnership Agreement that contained a number of material misrepresentations or omissions about BWF OPP.

108.　For example, these materials misrepresented the number of EB-5 investors who would invest in BWF OPP, the amount of BWF OPP's capital, the amount BWF MGMT would

contribute to BWF OPP, that DiFerdinando and Boardwalk Fries were extensively involved in the management of BWF OPP, BWF MGMT, and BWF LLC, and that BWF LLC existed at the time Plaintiffs executed the Partnership Agreement.

109. The Management Defendants also made a number of false statements or omissions to Plaintiffs after they decided to invest in BWF OPP. All or some of these Management Defendants, for example, told Plaintiffs that they were actively developing Boardwalk Fries restaurants in Ohio and that they had deposited $500,000 with ML Barnard to facilitate the construction of Boardwalk Fries restaurants.

110. Each of these false statements was made with knowledge, or with such disregard and recklessness as to whether they were true or false that knowledge may be inferred.

111. These statements were made with the intent of misleading Plaintiffs to rely on these statements.

112. Plaintiffs justifiably relied on these false statements and/or omissions when deciding to invest in BWF OPP, and when deciding to remain invested in BWF OPP. These were material representations about the size, scope, and financing of BWF OPP, and about the risk of loss Plaintiffs faced in this investment.

113. The Management Defendants' misrepresentations proximately caused Plaintiffs' injuries and loss because Plaintiffs would not have invested in BWF OPP, and would not have remained invested in BWF OPP, but for these misrepresentations.

114. These material misrepresentations also cut to the very core of BWF OPP's feasibility as stated in the Partnership Agreement and Business Plan.

115. As a direct and proximate result of the Management Defendants' fraud, Plaintiffs have been damaged in an amount in excess of $3,500,000, plus interest, attorney's fees, and

costs, punitive damages, and any other relief as provided by law.

**Count III – Breach of Contract**

**(Terry Chan, Gary Chan, Jacquelyn Chan, BWF OPP, BWF MGMT, BWF LLC,**

**Archway)**

116.	Plaintiffs restate paragraphs 1 through 92 above as if fully rewritten.

117.	BWF MGMT, which is and was controlled by BWF LLC, Archway, and the remaining Management Defendants during all relevant times, entered into the Partnership Agreement with Plaintiffs.

118.	BWF MGMT, BWF LLC, and Archway were each controlled by the Chans such that they had no independent mind or will or its own.  Instead, they acted as instruments of the Chans.

119.	The Partnership Agreement explicitly states that the purpose of BWF OPP is to open and operate ten Boardwalk Fries restaurants in Ohio.

120.	The Partnership Agreement further notes, in a section titled "Duties and Obligations of General Partner," that BWF MGMT  "shall cause the Partnership to conduct its business and operations separate and apart from that of the [BWF MGMT] and affiliates." Further, BWF MGMT had to "segregat[e] Partnership assets" under the Partnership Agreement, and had to ensure the "funds or other assets of the Partnership to be commingled with the funds or other assets of, held by, or registered in the name of [BWF OPP] or any of its affiliates."

121.	BWF MGMT further had an obligation to care for Plaintiffs' funds, and could only maintain partnership funds "not otherwise invested" in accounts belonging to the partnership or its affiliates, in short-term liquid securities, or in escrow accounts.

122.	As detailed in the foregoing paragraphs, the Management Defendants have failed

to conduct themselves in the best interests of the partnership. In doing so, the Management Defendants have breached the Partnership Agreement by, among other things: (1) failing to ensure the partnership conducted its business and operations separate and apart from BWF MGMT or its affiliates; (2) failing to segregate Plaintiffs' funds from the funds of BWF MGMT or any of its affiliates; (3) engaging in self-dealing; (4) failing to care for Plaintiffs' funds and allowing these funds to be converted; and, (5) failing to maintain Plaintiffs' funds in accounts belonging to BWF OPP or its affiliates, in short-term liquid securities, or in escrow accounts.

123. As a direct and proximate result of the Management Defendants' numerous breaches of contract, Plaintiffs have been damaged in an amount in excess of $3,500,000, plus interest, attorney's fees, and costs, punitive damages, and any other relief as provided by law.

## Count IV – Breach of Fiduciary Duty

## (Terry Chan, Gary Chan, Jacquelyn Chan, BWF OPP, BWF MGMT, BWF LLC, Archway)

124. Plaintiffs restate paragraphs 1 through 92 of the Complaint as if fully rewritten.

125. The Management Defendants owe Plaintiffs a statutory, contractual, and common law duty of the utmost good faith and loyalty in the handling of the project and their investment funds.

126. This fiduciary relationship is confirmed by the Partnership Agreement, which granted BWF MGMT "the sole and exclusive right and responsibility to manage the business" of BWF OPP. Limited partners, such as Plaintiffs, did not "have any right or power to take part in the management or control of the Partnership or its business and affairs or to act for or bind the Partnership in any way." Plaintiffs therefore relied on the Management Defendants to act for their benefit and protect the partnership.

127.     Given the fundamental nature of this partnership and specific references to immigration processes in the Partnership Agreement, the Management Defendants were under a duty to use their best efforts to run BWF OPP in a manner that would result in the creation of jobs and to secure Plaintiffs' EB-5 visas.  The Management Defendants have breached this duty to Plaintiffs by failing to open even a single restaurant and by embezzling Plaintiffs' funds.

128.     The Management Defendants each owe or owed a fiduciary duty towards Plaintiffs.

129.     The Management Defendants breached this fiduciary duty by, among other things, converting Plaintiffs' funds and failing to ensure that BWF OPP carried out the purposes defined in the Partnership Agreement.

130.     As a direct and proximate result of the Management Defendants' numerous breaches of their fiduciary duties toward Plaintiffs, Plaintiffs have been damaged in an amount in excess of $3,500,000, plus interest, attorney's fees, and costs, punitive damages, and any other relief as provided by law.

### **Count V – Gross Negligence**

**(Terry Chan, Gary Chan, Jacquelyn Chan, BWF OPP, BWF MGMT, BWF LLC, Archway)**

131.     Plaintiffs restate Paragraphs 1 through 92 of the Complaint as if fully rewritten.

132.     The Management Defendants owed Plaintiffs a duty of care to properly manage BWF OPP and Plaintiffs' investment funds consistent with the Partnership Agreement, EB-5 rules and regulations, and the representations made to Plaintiffs as described above.

133.     This standard of care of a general partner in an Ohio limited partnership is detailed in O.R.C. § 1782.241(A), which says that a general partner "shall perform the duties of a

general partner in good faith, in a manner the general partner reasonably believes to be in or not opposed to the best interests of the limited partnership, and with the care that an ordinarily prudent person in a like position would use under similar circumstances."

134.    The Management Defendants have violated their standard of care to Plaintiffs by, among other things: (1) engaging in self-dealing transactions; (2) failing to ensure the partnership conducted its business and operations separate and apart from BWF OPP or its affiliates; (3) failing to segregate Plaintiffs' funds from the funds of BWF MGMT or any of its affiliates; (4) failing to invest funds according to the stated purposes and intent of the partnership; (5) failing to maintain Plaintiffs' funds in accounts belonging to BWF OPP or its affiliates, in short-term liquid securities, or in escrow accounts; and, (6) failing to care for Plaintiffs' funds.

135.    As a direct and proximate result of the Management Defendants' gross negligence, Plaintiffs have been damaged in an amount in excess of $3,500,000, plus interest, attorney's fees, and costs, punitive damages, and any other relief as provided by law.

## Count VI - Conversion

### (All Defendants)

136.    Plaintiffs restate Paragraphs 1 through 92 of the Complaint as if fully rewritten.

137.    Defendants have, without authorization, knowingly asserted dominion and control over Plaintiffs' specific and identifiable property, the investment funds, that are owned and/or properly payable to Plaintiffs.  Defendants' conversion is inconsistent with Plaintiffs' rights and ownership of said property.

138.    Defendants have transferred Plaintiffs' funds directly to themselves for their own benefit, and have used Plaintiffs' funds to benefit Chan Entities that are in no way related to

BWF OPP's business purpose.

139.     As a direct and proximate result of Defendants' conversion of Plaintiffs' funds, Plaintiffs have been damaged in an amount in excess of $3,500,000, plus interest, attorney's fees, and costs, punitive damages, and any other relief as provided by law.

## **Count VII – Breach of O.R.C. § 1782.242 and Rescission of the BWR Investment**

## **(Terry Chan, Gary Chan, Jacquelyn Chan, BWF OPP, BWF MGMT, BWF LLC, Archway)**

140.     Plaintiffs restate paragraphs 1 through 92 of the Complaint as if fully rewritten.

141.     Partners in a partnership are generally prohibited from engaging in self-dealing transactions without the approval of other partners.

142.     Under Ohio law, "[n]o contract, action, or transaction shall be void or voidable with respect to a limited partnership" because of self-dealing if one of three exceptions applies. O.R.C. § 1782.242.   These exceptions apply when: (1) the material facts of the transaction are disclosed in writing to every partner before the partner is admitted in the partnership; (2) the material facts of the transaction are disclosed in writing to all partners, the transaction is fair to the limited partnership, and a majority of disinterested partners authorize the transaction; or, (3) the transaction is fair, and is authorized and approved by a majority of the disinterested limited partners. O.R.C. § 1782.242(A)-(C).

143.     As is detailed above, the Management Defendants have engaged in a pattern of self-dealing to the detriment of Plaintiffs.   The Management Defendants have directed all of Plaintiffs' investments to entities controlled by the Chans for the exclusive benefit of the Chans.

144.     These acts of self-dealing are prohibited because: (1) these transactions were not disclosed to Plaintiffs before they joined the partnership; (2) the material facts of the transactions

were never disclosed in writing to all partners, nor approved by a *disinterested* general partner; and, (3) these transactions were never approved by a majority of disinterested limited partners.

145.    As a direct and proximate result of the Management Defendants' pattern of self-dealing, Plaintiffs have been damaged in an amount in excess of $3,500,000, plus interest, attorney's fees, and costs, punitive damages, and any other relief as provided by law.  Plaintiffs also sees to rescind the investment that BWF OPP made in any entities affiliated with the Management Defendants.

### Count VIII – Unjust Enrichment/Quantum Meruit

### (All Defendants)

146.    Plaintiffs restate Paragraphs 1 through 92 of the Complaint as if fully rewritten.

147.    Plaintiffs conferred a substantial benefit on Defendants by investing $3,500,000 in BWF OPP.

148.    Defendants have misappropriated and wasted Plaintiffs' investment funds as alleged above.

149.    Under the circumstances, it would be unjust to Plaintiffs to allow Defendants to retain the benefits conferred upon them by Plaintiffs.

150.    Plaintiffs have been damaged by Defendants' conduct in excess of $3,500,000, plus interest, attorney's fees, costs, punitive damages and other relief as provided by law.

### Count IX – Violation of the Ohio Deceptive Trade Practices Act

### (Terry Chan, Gary Chan, Jacquelyn Chan, BWF OPP, BWF MGMT, BWF LLC, Archway)

151.    Plaintiffs restate Paragraphs 1 through 92 of the Complaint as if fully rewritten.

152.    O.R.C. § 4165.02(A) provides that a person engages in a deceptive trade practice

when, in the course of a person's business, vocation, or occupation, the person engages in certain conduct. Prohibited conduct under the statute occurs when a person, "[c]auses likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services," "[c]auses likelihood of confusion or misunderstanding as to the affiliation, connection, or association with, or certification by, another," "[u]ses deceptive representations or designations of geographic origin in connection with goods or services," or "represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, [or] benefits … that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have."

153. Each Management Defendant is a "person" within the meaning of O.R.C. § 4165.01(D).

154. Each Management Defendant engaged in trade and/or commerce.

155. As is stated above, the Management Defendants made false or misleading statements of fact and omissions of fact that caused confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services. Defendants also made false or misleading statements of fact and omissions of fact concerning BWF OPP's affiliations, connections, and associations with certain entities.

156. For example, Defendants stated that DiFerdinando and Boardwalk Fries were extensively involved in the management and operations of BWF OPP, BWF MGMT, and BWF LLC. All or one of the Chans may have forged DiFerdinando's signature on the Partnership Agreement to make it appear like BWF OPP had the sponsorship, approval, and affiliation of DiFerdinando and Boardwalk Fries. These representations were not true.

157. The Management Defendants' statements and/or omissions materially impacted

Plaintiffs' decision to invest with BWF OPP. But for these statements and/or omissions, Plaintiffs would not have purchased any interest in BWF OPP.

158. The Management Defendants' unfair acts or practices were likely to, and did in fact, deceive reasonable customers about the true quality, characteristics, and benefits of BWF OPP.

159. Even after Plaintiffs invested with BWF OPP, the Management Defendants continued to lie about, or failed to update Plaintiffs about, among other things, the status of DiFerdinando and Boardwalk Fries' involvement in BWF OPP, the construction of Boardwalk Fries restaurants, and the operation of BWF OPP.

160. As a direct and proximate result of the Management Defendants' conduct, Plaintiffs have been damaged in an amount in excess of $3,500,000, plus interest, attorney's fees, and costs, punitive damages, and any other relief as provided by law.

## Count X – Violation of Ohio Consumer Sales Practices Act

**(Terry Chan, Gary Chan, Jacquelyn Chan, BWF OPP, BWF MGMT, BWF LLC,**

**Archway)**

161. Plaintiffs restate Paragraphs 1 through 92 of the Complaint as if fully rewritten.

162. The Ohio Consumer Sales Practices Act ("CSPA"), O.R.C. § 1345.01, *et seq.*, prohibits suppliers from committing unfair and deceptive acts or practices in connection with a consumer transaction. The CSPA prohibits unfair or deceptive acts or practices whether they occur before, during, or after the transaction.

163. Among other things, unfair or deceptive acts prohibited under the CSPA include stating that "the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have," and that "the supplier has a

sponsorship, approval, or affiliation that the supplier does not have." O.R.C. § 1345.02(B)(1), (9).

164. The Management Defendants are each a "supplier" as that term is defined in the CSPA. O.R.C. § 1345.01(C).

165. Plaintiffs are each a "consumer" as that term is defined in the CSPA. O.R.C. § 1345.01(D).

166. Plaintiffs purchased the interest in BWF OPP for personal, family, or household purposes.

167. The Management Defendants' conduct as detailed herein violated the CSPA because, among other things, the Management Defendants represented that BWF OPP has the sponsorship, approval, performance, characteristics, or uses that BWF OPP did not have, and Defendants represented that they had a sponsorship, approval, or affiliation that they did not have.

168. As is detailed above, the Management Defendants made false or misleading representations and statements of fact concerning BWF OPP, and these various representations and statements, combined with the selective and intentional silence of the Management Defendants at certain times, damaged Plaintiffs.

169. The Management Defendants' unfair conduct and failure to disclose information as described above materially influenced Plaintiffs' decision to purchase an interest in BWF OPP and to stay in BWF OPP. But for the Management Defendants' unfair and deceptive acts and practices, Plaintiffs would not have invested with BWF OPP or remained in BWF OPP.

170. The Management Defendants' unfair and deceptive acts or practices were likely to and did in fact deceive reasonable customers, including Plaintiffs, about the true nature,

quality, characteristics, affiliation, sponsorship, and benefits of BWF OPP.

171.    The Management Defendants' conduct were, and are, unfair and deceptive acts and/or practices in violation of the CSPA.

172.    As a direct and proximate result of the Management Defendants' conduct, Plaintiffs have been damaged in an amount in excess of $3,500,000, plus interest, attorney's fees, and costs, punitive damages, and any other relief as provided by law.

## Count XI – Ohio Securities Law Violations

**(Terry Chan, Gary Chan, Jacquelyn Chan, BWF OPP, BWF MGMT, BWF LLC, Archway)**

173.    Plaintiffs restate Paragraphs 1 through 92 of the Complaint as if fully rewritten.

174.    Ohio law has many requirements that govern the sale of securities.  *See* O.R.C. 1707.01, *et seq.*

175.    Among other things, Ohio law requires that "the sale of securities representing an interest in a partnership … [or] limited partnership" may be carried out only upon compliance with certain registration requirements.  O.R.C. § 1707.06(3).

176.    Upon information and belief, the Management Defendants did not ensure that the sale of BWF OPP limited partner interests were properly registered with Ohio Division of Securities.  *See* O.R.C. § 1707.08.

177.    As is discussed herein, Plaintiff also received a Business Plan and Partnership Agreement from the Management Defendants touting the structure, organization, and purpose of BWF OPP.  As is also discussed herein, many of the statements contained in these materials are false, as BWF OPP does not remotely resemble what was discussed in these materials.

178.    Under O.R.C. § 1707.41(A), the Management Defendants are liable for the "loss

or damage" sustained by Plaintiffs, who relied on these materials, the false material statements contained therein, and the Management Defendants' omissions of materials facts, to invest in BWF OPP.

179.     Further, under O.R.C. § 1707.43(A), "every sale or contract for sale made in violation of Chapter 1707 of the Revised Code is voidable at the election of the purchaser." Each person that participated in or aided the seller of these securities is jointly and severally liable to Plaintiffs "for the full amount paid by [Plaintiffs] and for all taxable court costs."

180.     As a direct and proximate result of the Management Defendants' conduct, Plaintiffs have been damaged in an amount in excess of $3,500,000,  plus interest, attorney's fees, and costs, punitive damages, and any other relief as provided by law.

## Count XII – Accounting

**(Terry Chan, Gary Chan, Jacquelyn Chan, BWF OPP, BWF MGMT, BWF LLC,**

**Archway)**

181.     Plaintiffs restate Paragraphs 1 through 92 of the Complaint as if fully rewritten.

182.     The Management Defendants had a fiduciary duty to care for Plaintiffs' funds and to use BWF OPP's funds for appropriate purposes.

183.     The Management Defendants failed to properly care for Plaintiffs' funds, and have used these funds to, among other things, enrich themselves and finance the operation of unaffiliated businesses.

184.     Plaintiffs request a judgment ordering the Management Defendants to provide a detailed and comprehensive accounting for BWF OPP to this Court and to the Plaintiffs for the period commencing January 1, 2014 to today.

## Count XIII – Conspiracy

### (All Defendants)

185.    Plaintiffs restate Paragraphs 1 through 92 of the Complaint as if fully rewritten.

186.    Defendants, individually and on behalf of the entities they control, entered into a malicious combination to injure Plaintiffs by fraudulently misrepresenting material facts to Plaintiffs.  These misrepresentations were made to obtain Plaintiffs' investment and convert it for Defendants' own personal gain rather than for the purpose of securing Plaintiffs' EB-5 visas and fulfilling the purposes of BWF OPP.

As a direct and proximate result of Defendants' civil conspiracy, Plaintiffs have been damaged in an amount in excess of $3,500,000, plus interest, attorney's fees, and costs, punitive damages, and any other relief as provided by law.

WHEREFORE, Plaintiffs demands judgment against the Defendants for the following relief:

a.    Compensatory damages against Defendants in an amount in excess of $3,500,000, the exact amount to be proven at trial, and statutory damages;

b.    An accounting of BWF OPP's assets from January 1, 2014 to today;

c.    Forfeiture of any fees paid to Defendants;

d.    Punitive damages, the exact amount to be determined at trial; and,

e.    Such other relief as the Court deems just and equitable, including pre-judgment and post-judgment interest, costs, and attorney's fees.

Respectfully submitted,

*/s/ Christopher D. Cathey*
Christopher D. Cathey (0071231)
Justin J. Joyce (0090683)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
250 E. Fifth Street, Suite 2200
Cincinnati, OH 45202-5118
Telephone:  (513) 369-4214
Facsimile:  (513) 421-0991
Email:  ccathey@porterwright.com
Email:  jjoyce@porterwright.com
*Attorneys for Plaintiffs*

## JURY DEMAND

Under Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury.

Respectfully submitted,

*/s/ Christopher D. Cathey*
Christopher D. Cathey (0071231)
Justin J. Joyce (0090683)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
250 E. Fifth Street, Suite 2200
Cincinnati, OH 45202-5118
Telephone:  (513) 369-4214
Facsimile:  (513) 421-0991
Email:  ccathey@porterwright.com
Email:  jjoyce@porterwright.com
*Attorneys for Plaintiffs*