# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT CINCINNATI

CHUNHONG JIA; NAIHAN LI; NAIRUO    :
LI; SHULEI WANG; LIZHONG YAO;     :
WEIWEI ZHANG; CHONG ZHAO,      :    Case No. 1:18cv85
                           :
       Plaintiffs;        :
                           :    Judge:
v.                          :
                           :    **PLAINTIFFS' EMERGENCY**
GARY CHAN; TERRY CHAN;       :    **MOTION FOR AN**
JACQUELYN CHAN; BOARDWALK   :    **EX PARTE TEMPORARY**
FRIES OPPORTUNITIES, L.P.; BWF   :    **RESTRAINING ORDER**
MGMT, LLC; BOARDWALK FRIES, LLC; :
JARDIN HILL, LLC; ARCHWAY      :
PARTNERS, LLC; CLEARWATER     :
HOSPITALITY GROUP, LLC,       :
                           :
       Defendants.      :

---

Plaintiffs Chunhong Jia, Naihan Li, Nairuo Li, Shulei Wang, Lizhong Yao, Weiwei Zhang, and Chong Zhao ("Plaintiffs") hereby move this Court, pursuant to Federal Rule of Civil Procedure 65, for an emergency *ex parte* temporary restraining order freezing the bank accounts of Defendants Gary Chan, Terry Chan, Jacquelyn Chan, Boardwalk Fries Opportunities, L.P., BWF MGMT, LLC, Boardwalk Fries, LLC, Jardin Hill, LLC, Archway Partners, LLC, and Clearwater Hospitality Group, LLC. This motion is supported by the Declaration of Plaintiffs' counsel, Christopher Cathey, the Declarations of Lili Wang, Dave Hewitt, and the attached Memorandum in Support.

Respectfully submitted,

*/s/ Christopher D. Cathey*

Christopher D. Cathey (0071231)
Justin J. Joyce (0090683)
PORTER, WRIGHT, MORRIS &
ARTHUR LLP
250 E. Fifth Street, Suite 2200
Cincinnati, OH 45202
Telephone:  (513) 369-4214
Facsimile: (513) 421-0991
Email:  ccathey@porterwright.com
Email:  jjoyce@porterwright.com

*Attorneys for Plaintiffs*

# MEMORANDUM IN SUPPORT

## I. INTRODUCTION

Plaintiffs Chunhong Jia, Naihan Li, Nairuo Li, Shulei Wang, Lizhong Yao, Weiwei Zhang, and Chong Zhao ("Plaintiffs") bring this action against Defendants Gary Chan, Terry Chan, Jacquelyn Chan, Boardwalk Fries Opportunities, L.P. ("BWF OPP"), BWF MGMT, LLC ("BWF MGMT"), Boardwalk Fries, LLC ("BWF LLC"), Jardin Hill, LLC ("Jardin"), Archway Partners, LLC ("Archway"), and Clearwater Hospitality Group, LLC ("Clearwater") (collectively, "Defendants"), to recover funds they invested in BWF OPP and other damages. Terry Chan, Gary Chan, and Jacquelyn Chan (collectively, "the Chans") have lured Plaintiffs' collective investment of $3,500,000 based on numerous misrepresentations and have forged documents to conceal the fact that they have misappropriated Plaintiffs' investment proceeds to finance other business ventures and enrich themselves. The Chans have used Defendants BWF OPP, BWF MGMT, BWF LLC, Jardin, Archway, and Clearwater (collectively, the "Chan Entities"), entities that the Chans control, to orchestrate their fraudulent scheme to improperly convert large amounts of BWF OPP's funds that were supposed to be used to construct Boardwalk Fries restaurants, but were improperly spent on unrelated purposes.

Plaintiffs seek an *ex parte* temporary restraining order ("TRO") to freeze Defendants' bank accounts and assets to protect Plaintiffs from immediate and irreparable harm. Plaintiffs request that this Court freeze all bank accounts controlled by Defendants, including bank accounts, escrow accounts, and the following specific accounts:

- BWF OPP's bank account at General Electric Credit Union, which has an account number ending in x910,

- Escrow accounts at U.S. Bank, National Association in Plaintiffs' names, including accounts ending in x7001 (Chong Zhao), x7002 (Weiwei Zhang), x7004

(Nairuo Li), x7005 (Naihan Li), x7006 (Lizhong Yao), x7007 (Chunhong Jia), and x7008 (Shulei Wang).

- Bank accounts in Defendants' names at First Financial Bank, and,

- Bank accounts in Defendants' names at PNC Bank, National Association.

Plaintiffs also respectfully request that this Court freeze all assets owned by Defendants, including all assets purchased using Plaintiffs' or BWF OPP's funds, which may include personal property owned by the Chans. As is demonstrated below, Plaintiffs cannot account for over $1,000,000 transferred out of BWF OPP's General Electric Credit Union bank account by the Chans and requests for an accounting of the BWF OPP project funds have been repeatedly ignored. The unaccounted for funds coupled with the fact that not a single Boardwalk Fries restaurant has been developed demonstrates that the Chans have used these funds to enrich themselves and inappropriately benefit other business ventures that they are involved with.

## II.    STATEMENT OF FACTS

Plaintiffs are seven Chinese citizens who want to become lawful and permanent United States residents through the EB-5 Visa program. The EB-5 program has three key components: (a) immigrant investment of capital; (b) in a new commercial enterprise; that (c) creates jobs. An immigrant investor must invest at least $1,000,000 of capital in new commercial enterprise that creates at least 10 jobs to avail themselves of the EB-5 program, unless the immigrant invests his or her capital in what is called a "targeted employment area." If the immigrant invests in a targeted employment area, the immigrant must only invest $500,000. Investors that meet EB-5 program requirements are eligible for permanent residence in the United States.

BWF OPP was created to take advantage of the EB-5 program, and Plaintiffs invested in this entity with the hope of becoming lawful permanent United States residents. BWF OPP is an Ohio limited partnership that was purportedly created to open and operate ten Boardwalk Fresh

Burgers and Fries, Inc. ("Boardwalk Fries") restaurants in Ohio. BWF OPP is controlled by its general partner, BWF MGMT, which is itself controlled by BWF, LLC. Each of these three entities is not independent, however, but is ultimately controlled by Chans.

A. **The Chans Made a Number of False Representations To Plaintiffs When Marketing BWF OPP, and BWF OPP's Structure is a Sham**

Plaintiffs invested in BWF OPP in 2014. (Decl. of Lili Wang at 1 ("L. Wang Decl."), attached hereto as **Exhibit A**). Before each Plaintiff invested in BWF OPP, they received a copy of BWF OPP's Comprehensive Business Plan ("Business Plan"), which is attached hereto as **Exhibit B**. (*Id.* at 2). BWF OPP's Business Plan extensively detailed BWF OPP's purported structure, funding, and scope, and was used to market BWF OPP as a viable business enterprise.

For example, the Business Plan informed Plaintiffs that BWF OPP was part of an EB-5 investment project focused on developing ten Boardwalk Fries restaurants in Ohio. (Business Plan at 2, 4). The Business Plan also informed Plaintiffs that BWF OPP would accept 12 foreign investors as limited partners, and that each investor was required to invest $500,000. (*Id.* at 4). This structure ensured that a total of $6,000,000 would ultimately be invested by foreign investors. (*Id.* at 4). This foreign investment was supposed to be supplemented by a $3,000,000 contribution from BWF MGMT, meaning that BWF OPP was supposed to be funded with a total of $9,000,000. (*Id.* at 5). BWF OPP currently only has seven investors – Plaintiffs. BWF MGMT has never contributed $3,000,000 to BWF OPP. (L. Wang Decl. at 2).

Boardwalk Fries' purported involvement in BWF OPP is a consistent theme in BWF OPP's Business Plan. David DiFerdinando ("DiFerdinando"), the President of Boardwalk Fries, is listed as part of BWF OPP's management team. (Business Plan at 29-30). The Business Plan also conflated BWF LLC, which managed BWF MGMT and therefore BWF OPP, with Boardwalk Fries, and represented to Plaintiffs that these entities were one and the same. For

example, the Business Plan explained that BWF LLC "was founded in 1981 in Ocean City, Maryland … [and] now operates and franchises 17 restaurants in eight states." (*Id.* at 4). BWF LLC, however, was organized by Gary Chan in Ohio on November 5, 2015. (Decl. of Christopher Cathey at 2, Ex. 1 ("Cathey Decl."), attached hereto as **Exhibit C**).

BWF LLC is accordingly not the entity the Business Plan held it out to be. This distinction is important, as the Chans were integrally involved in structuring BWF OPP and in creating all of BWF OPP's marketing materials. (*See, e.g., id.* at 29-30 (explaining that Terry and Jacquelyn Chan were part of BWF OPP's management team)).

BWF OPP's Agreement of Limited Partnership ("Partnership Agreement"), attached hereto as **Exhibit D**, confirmed a number of representations made in BWF OPP's Business Plan. The Partnership Agreement explained that the purpose of BWF OPP was to: (1) own and operate ten Boardwalk Fries restaurants in Ohio, and (2) to own and lease real estate to Boardwalk Fries franchises. (Partnership Agreement at 4). It also confirmed that BWF MGMT was supposed to contribute $3,000,000 to BWF OPP, and that BWF OPP would be partially funded by $500,000 investments from 12 foreign investors. (*See id.* at 27 (schedule of partners)).

The Partnership Agreement additionally informed Plaintiffs that BWF MGMT, as BWF OPP's general partner, was bound to a number of contractual duties. (*Id.* at 4, 16-18). For example, the Partnership Agreement required BWF MGMT to segregate BWF OPP's assets, and prohibited BWF MGMT from allowing "funds or other assets of [BWF OPP] to be commingled with the funds or other assets of, held by, or registered in the name of [BWF MGMT] or any of its affiliates." (*Id.* at 16). This duty went hand-in-hand with BWF MGMT's duty to care for BWF OPP's funds under the Partnership Agreement. (*Id.* at 14).

BWF OPP's Partnership Agreement was purportedly signed by DiFerdinando in his

capacity as President of BWF LLC, the manager of BWF MGMT. (Partnership Agreement at 29). DiFerdinando, however, may not have signed this document, as he claims that his signature on BWF OPP's Management Agreement is not his. (Cathey Decl. at 3-4, Ex. 8). In fact, DiFerdinando also alleges that he is not a principal or involved in the management of BWF OPP, BWF MGMT, or BWF LLC, and that Boardwalk Fries only agreed to enter into a development and/or franchise agreement to sell Boardwalk Fries franchises to Jardin Hill. (*Id.*). Thus, it is apparent to the Plaintiffs that multiple material representations to them in the Partnership Agreement and Business Plan are false.

Plaintiffs, however, were not aware of the Chans' fraud at the time they invested in BWF OPP. Each Plaintiff executed a copy of the Partnership Agreement in 2014 to become a BWF OPP investor. (L. Wang Decl. at 1-2). Each Plaintiff also signed a copy of BWF OPP's Subscription Agreement, a sample of which is attached hereto as **Exhibit E**. (*Id.*). In doing so, Plaintiffs acknowledged that they reviewed BWF OPP's Private Placement Memorandum ("PPM") and attachments to the PPM, which included the Business Plan. (*Id.* at 2) (PPM at 1, attached hereto as **Exhibit F**). BWF's PPM required that all funds be initially deposited into an escrow account, where they would be released upon the approval of two investors' I-526 petition. (PPM at 4). By sending in their respective investment proceeds to BWF OPP, Plaintiffs relied upon the veracity of the statements made in the Business Plan and PPM.

The Chans retained U.S. Bank, National Association ("U.S. Bank") to maintain these escrow accounts. (L. Wang Decl. at 2). Plaintiffs deposited $500,000 each into their respective U.S. Bank escrow accounts in 2014, and all but 10% of these funds were released from escrow when their I-526 petitions were approved in 2015. (*Id.* at 2-3). These funds were then deposited into BWF OPP's bank account at General Electric Credit Union. (*Id.* at 3).

**B.    The Chans Move BWF OPP to Florida to Continue their Course of Lies and Deception.**

The Chans' deception did not end once Plaintiffs invested in BWF OPP.  Instead, the Chans have repeatedly lied to Plaintiffs and reported that progress was being made in the construction and operation of Boardwalk Fries restaurants when, in fact, no such progress has been made.  There is accordingly nothing to show for Plaintiffs' combined $3,500,000 million investments made over three years ago.  The Chans have also forged documents sent to third parties to conceal the fact that they have converted Plaintiffs' investments, and to defraud these third parties.

For example, in early 2016, the Chans sent out a  newsletter to Plaintiffs to update them on the project.  (BWF OPP Winter 2015/2016 Newsletter ("Newsletter"), attached hereto as **Exhibit G**); (L. Wang Decl. at 3).  This newsletter explained that BWF OPP had: (1) developed sites for leasing and construction; (2) identified and retained ML Barnard, Inc. ("ML Barnard"), to build and develop restaurants; and, (3) placed deposits with contractors and vendors using BWF OPP funds.  (Newsletter at 1).  Included in this Newsletter was a letter, dated October 16, 2015, that was purportedly written by Albert Fedders of ML Barnard.  (*Id.* at 39).  This letter explained that $500,000 had been deposited with ML Barnard to "secure priority placement of construction services for multiple upcoming Boardwalk Fries restaurants." (*Id.*).

No one at ML Barnard ever wrote this letter.   (*See* Cathey Decl. at 4, Ex.9).  In fact, ML Barnard never entered into a contract to construct Boardwalk Fries restaurants and never charged the Chans or BWF OPP for any construction work related to Boardwalk Fries.  (*Id.*).  ML Barnard instead entered into a contract with Clearwater on June 1, 2015, to design and construct a Rodizio Grill restaurant in Liberty Township, Ohio.  (*Id.*).  ML Barnard billed Clearwater over $1,000,000 for this work, and on December 18, 2015, Clearwater told ML Barnard that it should

apply the $500,000 payment from BWF OPP to the invoices related to the Rodizio Grill construction. (*Id.*). Clearwater further told ML Barnard that "Rodizio and Boardwalk Fries were under the same umbrella." (*Id.*). The Rodizio Grill restaurants developed by ML Barnard, however, were not affiliated with BWF OPP, but were instead affiliated with an entirely different entity controlled by the Chans.

Despite reporting to Plaintiffs that significant progress was being made in the development of Ohio Boardwalk Fries restaurants, the Chans decided to shift BWF OPP's geographic focus from Ohio to Florida later in 2016. The Chans informed investors that they no longer wanted to open Boardwalk Fries restaurants in Ohio because they planned on moving to Orlando, Florida. (L. Wang Decl. at 3).

The Chans thereafter represented to Plaintiffs that they were planning on opening Boardwalk Fries restaurants in Bradenton, Florida; Buena Vista, Florida; Tampa, Florida; Middletown, New York; Poughkeepsie, New York; and, Holyoke, Massachusetts. (Boardwalk Fries Q2 2016 Construction Update 1-24, attached hereto as **Exhibit H**); (L. Wang Decl. at 3). This representation, like so many earlier representations to Plaintiffs, was false. According to DiFerdinando, the Chans, through Jardin Hill, only executed franchise agreements that call for the development of Boardwalk Fries restaurants on 451 E. Altamonte Drive in Altamonte Springs, Florida, and in the Vista Center Shoppes on Palm Parkway Boulevard in Buena Vista, Florida. (*See* Cathey Decl. at 2-3, Ex. 5).

In addition to defrauding Plaintiffs, the Chans have secured tenant allowances under false pretenses from landlords to purportedly build out Boardwalk Fries restaurants at these two locations. Ultimately, however, it appears like the Chans will not be able to develop a Boardwalk Fries restaurant at either location.

For example, DiFerdinando says that Terry Chan secured a $100,000 tenant improvement allowance at the Vista Centers location. (Cathey Decl. at 2, Ex. 4). To secure this allowance, Gary Chan sent the landlord a letter purportedly written by DCH Custom Builder, Inc., to show that the site was ready for development into a Boardwalk Fries restaurant. (*Id.*); (Decl. of Dave Hewitt at 1-2, attached hereto as **Exhibit I**). This letter, however, was fake. Dave Hewitt, the owner of DCH Custom Builder, Inc., says that his company did not write it. (*Id.*). No Boardwalk Fries will be opened at this location because, on January 25, 2018, the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida issued a writ of possession against the Chans and Clearwater allowing the landlord to take possession of this property. (Cathey Decl. at 4, Ex. 10).

Terry Chan also negotiated for a $900,000 tenant allowance at the Altamonte Springs location with that property's landlord. (Cathey Decl. at 3, Ex. 7). Terry Chan even received a $300,000 draw from this landlord that was supposed to be used to demolish portions of the property. (*Id.*). This work has not, and will not, be completed because the landlord will not approve the construction of a Boardwalk Fries restaurant at this location. (*Id.*).

Aside from the troubling lies and fraudulent conduct, Plaintiffs applied for and secured their conditional I-526 visas based on the false information and representations provided to them by the Chans. Their visas could therefore be jeopardized by the Chans' fraud.

Overall, it not only appears like the Chans have continued to engage in a pattern of fraudulent conduct related to Boardwalk Fries, but that they also do not have the capabilities necessary to open any Boardwalk Fries restaurants as represented to Plaintiffs. In 2014, Plaintiffs invested in BWF OPP with the expectation that Boardwalk Fries would be constructed and operated by the timelines established by the Chans. However, the Chans have failed to

develop a single Boardwalk Fries restaurant in four years.  Unless they are removed from this EB-5 project immediately, Plaintiffs investments and visas are in jeopardy of being lost.

### C. The Chans have Misappropriated a Large Amount of BWF OPP's Funds

In addition to the Chans' failure to open any Boardwalk Fries restaurants, evidence obtained by Plaintiffs demonstrates that the Chans have misappropriated funds belonging to BWF OPP.  A large portion of these funds were sent to ML Barnard to pay for the construction of Rodizio Grill restaurants.  As is demonstrated below, bank records also show that hundreds of thousands of dollars belonging to BWF OPP were directed to a number of the Chan Entities and were used to pay expenses associated with the operation of other restaurant concepts such as the Rodizio Grill.

For example, as is mentioned above, the Chans prepared a newsletter in 2016 that told Plaintiffs that $500,000 had been deposited with ML Barnard to "secure priority placement of construction services for multiple upcoming Boardwalk Fries restaurants."  (BWF OPP Winter 2015/2016 Newsletter at 39).  While the Chans did direct $500,000 to ML Barnard, these funds were used to pay for the construction of Rodizio Grill restaurants.  (Cathey Decl. at 4, Ex. 9).  In fact, the Chans never entered into a contract with ML Barnard to build Boardwalk Fries restaurants.  (*Id.*).  These funds were accordingly not used to open and operate a Boardwalk Fries restaurant despite Defendants' representation to the contrary.

Bank records also demonstrate that BWF OPP's assets have been comingled with assets belonging to affiliated Chan Entities.  For example, bank records show that on March 24, 2016, $120,000 of BWF OPP's funds were deposited into a BWF OPP account at First Financial Bank. (Cathey Decl. Ex. 2 - FFB_00000956).  From here, BWF OPP's funds were transferred to:

1.  An account that belonged to BWF MGMT[1];

2.  Then to an account that belonged to BWF LLC[2]; and,

3.  Then to an account belonging to "JH Money Market."[3]

This "JH Money Market" account belonged to Jardin Hill. (*Id.* at FFB_00000519). In March 2016, this Jardin Hill account held funds it received from other Chan Entities, such as Clearwater. (*Id.* at FFB_00000519-521).

The fact that $120,000 of BWF OPP's funds were deposited in this Jardin Hill account demonstrates that BWF OPP's funds were comingled with funds belonging to affiliated Chan Entities. Further, bank records in Plaintiffs' possession indicate that BWF OPP's $120,000 was eventually transferred out of this Jardin Hill account and into accounts belonging to other Chan entities such as Clearwater and Rodizio Grill entities to directly enrich the Chans and pay operating expenses related to Rodizio Grills.

Plaintiffs ultimately do not know the full extent of the Chans' unlawful conduct. Despite repeated requests, the Chans have refused to account for Plaintiffs' funds. (L. Wang Decl. at 3, Ex. 1) (emails sent by L. Wang asking for financial details that went unanswered). The Chans have also failed to provide quarterly updates about BWF OPP's progress and finances to Plaintiffs despite promising to do so. (*Id.* at 3).

To the best of Plaintiffs' knowledge, BWF OPP possesses less than $1,900,000 of the $3,500,000 that Plaintiffs' initially invested. As of June 2017, BWF OPP's General Electric Credit Union bank account held approximately $1,500,000. (*See* BWF OPP's "Q2 2017" Update at 3, attached hereto as **Exhibit J**); (L. Wang Decl. at 3). Further, Plaintiffs' individual escrow accounts at U.S. Bank only hold about $350,000, collectively, of Plaintiffs' funds. (*Id.* at 8-103).

---

[1] (Cathey Decl. Ex. 2 - FFB_00000956; FFB_00001018).
[2] (*Id.* at Ex. 2 - FFB_00001018; FFB_00002869).
[3] (*Id.* at Ex. 2 - FFB_00002869).

The evidence shows that BWF OPP has less than $1,900,000 of funds remaining, and that the Chans have spent at least $1,600,000 of Plaintiffs' funds, and have absolutely nothing to show for it. Plaintiffs, however, can only account for $500,000 that was paid to ML Barnard for Rodizio Grill construction, not Boardwalk Fries construction. Given that the Chans have clearly converted at least $500,000 of BWF OPP's funds, and that BWF OPP's funds have been comingled with funds belonging to other Chan entities and spent by the Chan entities, Plaintiffs are very concerned that the Chans are continuing to convert BWF OPP's funds and are using these funds to finance unrelated entities and enrich themselves. Unless the Court issues a TRO, there is a substantial danger that Plaintiffs' funds will be further converted and placed beyond this Court and Plaintiffs' reach.

## III.   LAW AND ARGUMENT

This Court should grant a TRO freezing bank accounts belonging to Defendants and preventing Defendants from transferring other assets. To determine whether a TRO is appropriate, this Court should evaluate whether: (1) Plaintiff has a strong likelihood of success on the merits of this action; (2) Plaintiff would suffer irreparable injury without the TRO; (3) issuing the TRO would cause substantial harm to others; and, (4) the public interest would be served by issuing the TRO. *Alahverdian v. Nemelka*, No. 3:15-cv-060, 2015 U.S. Dist. LEXIS 21266, *2-3 (S.D. Ohio Feb. 23, 2015) (evaluating an *ex parte* motion for a TRO). These "are factors to be balanced, not prerequisites that must be met." *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003). The degree of proof necessary for each factor depends on the strength of the other factors. *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 657 (6th Cir. 1996). Plaintiffs can demonstrate that each of the four factors is satisfied here.

Further, a TRO can be issued without written or oral notice to the adverse party or its attorney if: (1) specific facts in an affidavit or a verified complaint clearly shows that immediate

and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition, and (2) the movant's attorney certified in writing any efforts made to give notice and the reasons why it should not be required. Fed. R. Civ. P. 65(b)(1).

The evidence in support of this motion shows that immediate and irreparable harm will occur to Plaintiffs unless this Court grants Plaintiffs' motion for a TRO. Further, due to the extremely high risk of Defendants placing Plaintiffs' funds beyond the reach of this Court and the Plaintiffs, no notice should be given to Defendants because they have engaged in a pattern of criminal and fraudulent conduct and will likely abscond with funds before the TRO can go into effect. (*See* Cathey Decl. at 1-2). This Court should accordingly grant Plaintiffs' motion without notifying Defendants until after the TRO is entered.

### A. Plaintiffs' Claims Will Likely Succeed Because Defendants Converted Investor Funds, Breached the Partnership Agreement, and Committed Fraud

Plaintiffs will likely succeed on the merits of their claims. A Plaintiff is not required to prove his case in full to secure a TRO. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007). Instead, it is sufficient "if the [P]laintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Id.* A review of just three of the claims raised in Plaintiffs' Complaint shows that Plaintiffs' claims will succeed or, at the very least, raise a number of questions that are "so serious, substantial, difficult, and doubtful," as to make them fair ground for litigation.

1. *Plaintiffs Will Prevail on their Conversion Claim because the Chans Misappropriated Partnership Funds to Finance Unrelated Businesses*

Plaintiffs' conversion claim will succeed because the Chans used BWF OPP's funds to, among other things, line their own pockets and finance the construction and operation of other

restaurant concepts such as the Rodizio Grill. Conversion is "the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights." *Joyce v. General Motors Corp.*, 49 Ohio St. 3d 93, 96 (Ohio 1990). The Chans converted BWF OPP's funds every time they directed partnership funds to third parties or other Chan Entities for purposes unrelated to the construction and operation of Boardwalk Fries restaurants.

For example, as is discussed above, the Chans falsified a letter in 2016 that told Plaintiffs that $500,000 had been deposited with ML Barnard to "secure priority placement of construction services for multiple upcoming Boardwalk Fries restaurants." (BWF OPP Winter 2015/2016 Newsletter at 39). Michael Barnard of ML Barnard has confirmed that the Chans directed $500,000 to ML Barnard, but that these funds were used to pay for the construction of Rodizio Grill restaurants. (Cathey Decl. at 4, Ex. 9). Barnard also confirmed that ML Barnard never contracted with the Chans to build Boardwalk Fries restaurants. (*Id.*). This alone shows that BWF OPP's funds were converted, as these funds were spent on a project that in no way benefitted BWF OPP or Plaintiffs.

Bank records collected by Plaintiffs also demonstrate that the Chans directed BWF OPP's funds to bank accounts belonging to Chan Entities, where they were then spent on items unrelated to BWF OPP's purpose. These transactions clearly converted BWF OPP's funds, as they in no way facilitated the construction and operation of Boardwalk Fries restaurants. Instead, these transfers depleted BWF OPP's resources and provided no benefit to BWF OPP or Plaintiffs.

Of the at least $1,600,000 missing from BWF OPP's bank account and U.S. Bank escrow accounts, Plaintiffs can only account for the $500,000 diverted to ML Barnard. The Chans

therefore likely converted over $1,000,000 of Plaintiffs' funds for their own gain and to enrich the myriad of Chan entities involved in this fraudulent scheme. Plaintiffs' conversion claim will succeed on its merits.

2. *Plaintiffs Will Prevail on their Breach of Contract Claims because the Chans Violated Multiple Provisions in the Partnership Agreement*

Plaintiffs will also succeed on their breach of contract claims. Plaintiffs must show "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff" to demonstrate Defendants breached the Partnership Agreement. *Powell v. Grant Medical Center*, 148 Ohio App. 3d 1, 10 (Ohio 2002). The first two factors are satisfied here, as Plaintiffs have demonstrated that a contract, the Partnership Agreement, existed and that they performed under the Partnership Agreement by investing in BWF OPP.

The third element of a breach of contract claim, breach by the Defendants, also occurred here. As is mentioned above, the Partnership Agreement required that BWF MGMT and BWF LLC, as BWF MGMT's manager, segregate BWF OPP's assets and prevent "funds or other assets of [BWF OPP from being] commingled with the funds or other assets of, held by, or registered in the name of [BWF MGMT] or any of its affiliates." (Partnership Agreement at 16). The Partnership Agreement also mandated that BWF MGMT care for BWF OPP's funds. (*Id.* at 14). The Chans, BWF MGMT, and BWF LLC all breached this agreement by converting BWF OPP's funds and comingling them with funds in bank accounts belonging to Jardin Hill, Clearwater, and RG Opportunities LP ("RG OPP"), and to finance the construction of projects that had absolutely nothing to do with BWF OPP's business purpose.

Defendants' actions have caused damages, which satisfies the final element of a breach of contract claim. Hundreds of thousands of dollars belonging to BWF OPP have been converted by Defendants. These funds would not have been converted if the Chans, BWF MGMT, and BWF

LLC honored contractual duties and cared for BWF OPP's funds. Plaintiffs' harm is further confirmed by BWF OPP's Partnership Agreement, which says that every BWF OPP partner, including Plaintiffs, will "be irreparably damaged if any of the provisions of this [Partnership] Agreement are not performed in their specific terms." (*Id.* at 28). Plaintiffs can therefore prove every element of their breach of contract claims.

3.      *Plaintiffs' Claims Related to Securities Law Violations and Fraud Will Succeed Because the Chans Forged Documents and Signatures to Initiate and Continue their Fraudulent Scheme*

The Chans, BWF OPP, BWF MGMT, and BWF LLC violated a number of federal and Ohio securities laws when soliciting Plaintiffs' investments, including 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5. These statutes prohibit any person from making any untrue statement of material fact, or from omitting certain material facts, in connection with the purchase or sale of any security. Plaintiffs must demonstrate the following elements to succeed in their security law claims: (1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) and justifiably relied on by plaintiff, which (5) proximately caused injury. *Rubin v. Schottenstein, Zox & Dunn*, 119 F. Supp. 2d 787, 790 (S.D. Ohio 2000). These elements are similar to the elements of fraud in Ohio. *Id.* Defendants made a number of misrepresentations of material fact to Plaintiffs when soliciting their investments, and Plaintiffs relied on Defendants' misrepresentations to their detriment. Plaintiffs' claims will therefore succeed on their merits.

For example, BWF OPP's Business Plan repeatedly emphasized that DiFerdinando and Boardwalk Fries were integrally involved in BWF OPP. DiFerdinando was listed as a member of BWF OPP's management team, and the Business Plan indicated that BWF LLC was essentially Boardwalk Fries. (Business Plan at 4, 29-30). After all, Boardwalk Fries' history was detailed in the Business Plan to give BWF OPP more credibility, and to make it look like

BWF OPP was affiliated with a successful restaurant franchise that had existed since 1981. DiFerdinando and Boardwalk Fries, however, claim that there are in no way part of BWF OPP. (*See* Cathey Decl. at 2-3. On top of this, DiFerdinando alleges that his signature on the BWF OPP's Management Agreement was forged. (*Id.* at 3, Ex. 8).

The deception involving the participation of DiFerdinando and Boardwalk Fries in the management of BWF OPP cut to BWF OPP's viability and are therefore material. A statement is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding whether to invest. *See Werbowsky v. Am. Waste Servs.*, No. 97-4319, 1998 U.S. App. LEXIS 31984, *8 (6th Cir. Dec. 22, 1998) (discussing *TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438 (1976)). If Plaintiffs knew that Boardwalk Fries, which is the franchisor of the *very restaurant concept BWF OPP sought to create*, was not involved with the management of BWF OPP, they would not have invested in BWF OPP. (L. Wang Decl. at 2). If Boardwalk Fries is not involved and prepared to commit $3,000,000 to BWF OPP through BWF MGMT, then material misrepresentations have occurred. Defendants have therefore violated federal and state securities laws, and committed fraud, by repeatedly misrepresenting the very nature of BWF OPP to Plaintiffs.

**B.      Plaintiffs will be Irreparably Harmed if this Court does not Grant the Motion Because the Chans Have Engaged in A Pattern of Fraudulent Conduct, and have Already Misappropriated BWF OPP's Funds**

Plaintiffs will suffer irreparable harm if a TRO freezing Defendants' assets and bank accounts is not issued. Defendants have already falsified a number of documents to improperly obtain funds, including BWF OPP's Partnership Agreement, letters to investors, and communications sent to third parties. The Chans have also already misappropriated hundreds of thousands of dollars belonging to BWF OPP, and have commingled BWF OPP's assets with affiliated Chan entities. The Chans have therefore demonstrated that they are fraudsters, have

misappropriated Plaintiffs' investments proceeds, and will continue to abscond with BWF OPP's funds; an alarming thought given that they are the only persons that can currently access these funds and assets. The Chans will likely transfer, hide, or otherwise dissipate BWF OPP's funds and assets absent the TRO, which will irreparably harm Plaintiffs.

The Sixth Circuit generally holds that an injury is not irreparable if it can be fully remedied by monetary damages. *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). The Sixth Circuit and other courts also have, however, recognized that it is appropriate to issue a TRO in situations where the funds that may be used to compensate plaintiff could be lost, transferred, or otherwise spent. *See Performance Unlimited v. Questar Publishers*, 52 F.3d 1373, 1382 (6th Cir. 1995); *Elliot v. Kiesewetter*, 98 F.3d 47, 58 (3d Cir. 1996) ("That irreparable harm would occur absent an asset freeze is even more apparent where the very assets subject to a potential judgment will likely be dissipated without entry of the order."). As has been demonstrated above, this precise concern is applicable here, as Defendants have previously misappropriated BWF OPP's funds, and have repeatedly lied to persons and entities to obtain funds. A TRO is the only thing that will prevent Defendants from transferring or otherwise spending BWF OPP's remaining funds.

A TRO is also appropriate here despite the fact that Plaintiffs is seeking to recover monetary damages because Plaintiffs is also seeking equitable relief from this Court. Courts may issue a TRO when a plaintiff is seeking equitable relief because this type of relief has traditionally been within a Court's equitable authority. *Concheck v. Barcroft*, No. 2:10-cv-656, 2010 U.S. Dist. LEXIS 110325, *6-7 (S.D. Ohio Oct. 18, 2010) (granting preliminary injunction because claims seeking the return of money paid to defendants, including unjust enrichment

claims, were equitable in nature). Equitable relief is appropriate here because many of Plaintiffs' claims sound in equity, including Plaintiffs' unjust enrichment, fraud, and rescission claims.

The Partnership Agreement itself also highlights that Plaintiffs have been irreparably harmed by Defendants' conduct and allows Plaintiffs to obtain a TRO. The Partnership Agreement specifically states that every Partner, including Plaintiffs, will "be irreparably damaged if any of the provisions of this [Partnership] Agreement are not performed in their specific terms." (Partnership Agreement at 28). Courts have considered similar contractual language and used it to find irreparable harm. *See, e.g.*, *LNB Bancorp, Inc. v. Osborne*, No. 1:09-CV-643, 2011 U.S. Dist. LEXIS 137705, at *22-23 (N.D. Ohio Nov. 30, 2011) (considering language in a settlement agreement). The Partnership Agreement also allows Plaintiffs to pursue a TRO, as Plaintiffs "shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and specifically to enforce the terms and provisions hereof in any action instituted in any court of the United States." (*Id*.). This gives Plaintiffs the right to seek a TRO in this Court.

Finally, Plaintiffs will be irreparably harmed absent a TRO because they will likely lose their visas if the Chans' wrongful conduct continues unabated. As is mentioned above, the EB-5 program requires that an investor eventually demonstrate that their investment has created jobs in the United States. BWF OPP has completely failed to create any jobs because the Chans have failed to open any Boardwalk Fries restaurants in over three years. If a TRO is not issued, Plaintiffs will lose their ability to salvage their investment into BWF OPP, or redirect their investment into another EB-5 program because their investment will have been completely lost, and Plaintiffs may possibly lose their visas. If a TRO is not issued, Plaintiffs will be left only

with a worthless interest in a defunct business entity, will not be able to get their investment back, and will not be able to enjoy the gains of a successful restaurant business.

Plaintiffs have demonstrated that they will be irreparably harmed if a TRO is not issued. Plaintiffs have provided this Court with evidence showing that Defendants have already misappropriated large amounts of BWF OPP's funds, and that Defendants have been able to misappropriate these funds by lying to investors and third parties. The Chans will continue to harm Plaintiffs and will likely attempt to abscond with BWF OPP's assets if a TRO is not issued. This Court should accordingly grant the requested relief.

## C. Issuance of a Temporary Restraining Order Would Not Cause Substantial Harm to Others but Instead Ensures that Third Parties do not Contract with Sham Entities or Receive Fraudulent Transfers

The Third factor this Court must analyze is whether the issuance of a TRO would cause substantial harm to others. *Chabad*, 363 F.3d at 432. This factor again weighs in Plaintiffs' favor because issuing the TRO will likely protect third parties by ensuring that they do not contract with sham entities or receive fraudulent transfers of funds. So many people have been harmed by the Chans that the Court will actually help the Plaintiffs and third parties by putting a stop to the Chans' unlawful scheme.

As is demonstrated above, the Chans have repeatedly lied to third parties and forged documents in connection with the construction and operation of restaurants. For example, the Chans have stolen $100,000 from a Florida landlord by representing to the landlord that a Boardwalk Fries restaurant was ready to be constructed on the property. (Cathey Decl. at 2, Ex. 4). The Chans also obtained a $300,000 payment from another landlord to purportedly demolish part of that landlord's property, but have failed to perform this work. (*Id.* at 3, Ex. 7). Finally, the Chans directed $500,000 of BWF OPP's funds to ML Barnard to finance the construction of Rodizio Grill restaurants. (*Id.* at 4, Ex. 9). Defendants have accordingly shown that they are

willing to lie to third parties to construct Boardwalk Fries restaurants, and that they have misappropriated BWF OPP's funds.

Freezing Defendants' bank accounts and preventing the transfer of Defendants' assets will not harm others, but will instead protect innocent third parties from Defendants' fraudulent conduct. BWF OPP's very existence is threatened, as all evidence available indicates that it is a sham entity. Further, the remaining Defendants have either assisted in the creation and maintenance of this sham, or have received funds that belong to BWF OPP. Freezing assets and bank accounts belonging to Defendants will protect third parties who may otherwise contract with Defendants, and who may receive fraudulent transfers from Defendants. As with the other factors previously discussed herein, this weighs in favor of granting Plaintiffs' Motion.

### D. Granting Plaintiffs' Motion Serves the Public Interest by Deterring Fraud

Finally, issuing a TRO serves the public interest, the final factor in this Court's analysis. The Sixth Circuit has noted that "[e]nforcement of contractual duties is in the public interest." *Certified Restoration*, 511 F.3d at 551. This Court has also explained that the public interest is served "by deterring others from engaging in fraudulent transfer[s] of funds." *McGirr v. Rehme*, No. 1:16-cv-464, 2016 U.S. Dist. LEXIS 145576, *5 (S.D. Ohio Oct. 17, 2016). Plaintiffs have demonstrated that terms of the Partnership Agreement were breached, that Defendants have misappropriated BWF OPP's funds, and that Defendants will likely try to fraudulently transfer funds. This shows that the public interest is served by issuing a TRO.

## IV. CONCLUSION

Plaintiffs respectfully request that this Court grant the Motion for a TRO for the reasons detailed herein. Plaintiffs will likely succeed on their claims and will be substantial harmed if this Court does not grant the requested relief. Further, other parties will not be harmed by the issuance of a TRO, and the public interest will be served if this Court grants Plaintiffs' Motion.

This Court should grant Plaintiffs' motion before Defendants are notified of this action to protect Plaintiffs and others.

Respectfully submitted,

*/s/ Christopher D. Cathey*
Christopher D. Cathey (0071231)
Justin J. Joyce (0090683)
PORTER, WRIGHT, MORRIS &
ARTHUR LLP
250 E. Fifth Street, Suite 2200
Cincinnati, OH 45202
Telephone:  (513) 369-4214
Facsimile: (513) 421-0991
Email:  ccathey@porterwright.com
Email:  jjoyce@porterwright.com

*Attorneys for Plaintiffs*

DMS/10799771v.2